IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


UNITED STATES OF AMERICA                                PLAINTIFF/RESPONDENT

v.                              Civil No. 05-2099
                                Criminal No. 03-20049-001

RAYMOND L. PURDUM                                       DEFENDANT/MOVANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Raymond Purdum, a federal prisoner, brings a pro se motion to vacate, set aside, or correct

sentence pursuant to 28 U.S.C. § 2255.  The government filed a response to which Purdum replied.

Included in the response was an affidavit from defense attorney Mark Horoda which I have not

considered.


DISCUSSION

Purdum was charged in an 11-count indictment along with co-defendant Carl E. Clopp with

conspiracy to commit mail fraud, mail fraud, wire fraud, interstate transportation of property

obtained by fraud, conspiracy to commit money laundering, and asset forfeiture.

On April 7, 2004, pursuant to plea agreements, Purdum and Clopp pled guilty to Count 1

(conspiracy to commit mail and wire fraud and interstate transportation of property obtained by fraud

in violation of 18 U.S.C. § 371) and Count 10 (conspiracy to commit money laundering in violation

of 18 U.S.C. § 1956(h)).  On October 15, 2004, Purdum was sentenced by Honorable Robert T.

Dawson to 70 months in prison, 3 years supervised released, payment of $458,000 in restitution, and

a $200 special assessment.  He took no appeal.

In this proceeding, Purdum asserts the following grounds for relief:

- Purdum lacked the mental capacity to enter a guilty plea and be sentenced and the court and defense counsel failed to take proper action to protect Purdum's rights;

- The court nullified Purdum's waiver of appeal rights as provided in the plea agreement;

- The court committed sentencing errors – assessing duplicate enhancements to Count 1 for both more than minimal planning and being a leader/organizer, using the 1998 version of the Sentencing Guidelines, applying a 9-level assessment to Count 1 based on the amount involved, and considering a 1980's embezzlement conviction that was more than 10 years old - and defense counsel failed to object.

- The sentence violates *United States v. Booker*, ___U.S. ___, 125 S.Ct. 738 (2005).

*Background*

As set out in the presentence investigation (PSI) report, Purdum and Clopp, through ARLCO Corporation, solicited and obtained over $465,000 from investors purportedly to establish a pilot plant to do a certification production run using the Ellison Metal Extraction Process to process 60 one ton cycles of raw materials. The results of this certification production run were then to be used to raise additional funds, expand the operations, and obtain patents. The process involved deriving precious metals from coal fly ash. Purdum and Clopp deposited the investor funds into ARLCO's bank account in Oklahoma but wrote $318,000 of that for personal living expenses and to promote other money-making schemes and neither reported the money on their tax returns. Purdum put together the offering documents for investors and met with many of them to "close" the sale. He also made and appeared on the promotional video, signed lulling letters sent to investors, was responsible for creating fraudulent documents which falsely represented that certain "big money" investors had

agreed to provide funds for the project, and was the primary source of information about the purported progress of the venture fed to salespersons who in turn passed it along to the investors. Purdum purportedly resigned from ARLCO in late 1998 but by that time he and Clopp had essentially dissipated all of the investors' funds. Subsequent to his resignation, he and Clopp were involved in other solicitations of investors to fund testing of the metal extraction process and raise funds for ARLCO. See PSI report, p. 4, paragraphs 6-8. The PSI provides other specific details of the fraud perpetuated by Purdum and Clopp. PSI report, pp. 4-9, paragraphs 9-34.

Jury trial was scheduled for the morning of April 7, 2004. Approximately one hour before trial was to begin, Purdum and Clopp advised the court they wished to plead guilty to two counts of the indictment. They signed similar plea agreements that day.

Purdum's plea agreement stated that in exchange for his pleas to Counts 1 and 10, the United States agreed to dismiss all other counts, including the asset forfeiture count, and promised that no other charges would be filed arising out of the offenses contained in the indictment but that other uncharged related activity could be considered "relevant conduct" for purposes of sentencing. The agreement set out the maximum penalties for the offenses to which Purdum was pleading guilty and stated that Purdum understood he could not withdraw his plea merely because he did not like or agree with his sentence. The agreement provided that Purdum would be sentenced under the Sentencing Guidelines and would not appeal or challenge the constitutionality of the guidelines.

The parties further stipulated in the agreement that the base offense level for Count 1 was 6 under U.S.S.G. §2F1.1(a), a 9-level increase was warranted based on the intended loss under §2F1.1(b)(1)(K), a 2-level increase was warranted under §2F1.1(b)(2) for more than minimal planning, and a 4-level increase was warranted for role as an organizer and leader in the offense

under §3B1.1(a).  As to Count 10, the parties agreed that the base offense level was 23 pursuant to §2S1.1(a), enhancements were not warranted, and defendant was entitled to a three-level reduction for acceptance of responsibility under §3E1.1.  The parties agreed not to seek upward or downward departures.

The agreement further provided that Purdum had read the agreement, understood it and by his signature declared it was true and accurate and not the result of any threats or coercion, that he acknowledged that he was freely and voluntarily entering into the plea agreement, that he understood the nature of the offenses and the penalties provided by law, and that he was satisfied with the representation and advice of counsel.  The agreement stated that Purdum understood his rights to plead not guilty, to be tried by a jury with the assistance of counsel, to confront and cross-examine witnesses against him, to protection against compulsory self-incrimination, and to have the compulsory process for the attendance of defense witnesses.

At the plea proceeding, Purdum, age 58, was placed under oath.  Purdum testified he was taking prescription medication but did not think it affected his reasoning ability or judgment.  The court advised Purdum that it was "important for the Court to know that you know and understand why we're here and what we're doing this morning."  The court then told  Purdum that "[y]ou previously entered a plea of not guilty and we were advised a few minutes ago that you desired to change your plea to guilty. Do you understand that?" Purdum responded, "Yes, Your Honor." (Plea T. at 5).

Purdum indicated at the plea proceeding through his responses to the court's questioning that he had had an opportunity to review the indictment and the nature of the charges contained in the indictment had been explained to him; his willingness to plead guilty resulted from discussions

between his attorney and the government resulting in the plea agreement; he had signed the plea agreement and understood it and no promises or assurances had been made other than what was contained in the plea agreement; he understood the court could reject the plea terms and he could not withdraw his plea and the court could impose a harsher sentence than set out in the agreement; he had not been forced to plead guilty and was pleading guilty to a felony of his own free will and because he was guilty; he understood that for Count 1 the maximum penalty was 10 years in prison and $250,000 fine or twice the pecuniary gain or loss, for Count 10 the maximum penalty was 20 years in prison and a $500,000 fine or twice the pecuniary gain or loss, there was the real possibility of going back to prison for violation of supervised release and there would be an order of restitution in an amount determined by the court and a mandatory $100 special assessment per count; he understood he would be sentenced under the Sentencing Guidelines and had discussed with his attorney how the guidelines applied to his case; he was aware that the court would determine the sentence after review of the PSI report and that the court could take relevant conduct into consideration at sentencing.

The court repeated rights set out in the plea agreement – the right to plead not guilty and proceed to jury trial, the presumption of innocence, the burden on the government to prove guilty beyond a reasonable doubt, the right to counsel, the right to cross-examination of witnesses, the right to subpoena defense witnesses, and the right to testify or not testify. The court also advised that Purdum and the government had the right to appeal the sentence under some circumstances. The court further advised Purdum that if he pled guilty, there would be no trial and it would be difficult to withdraw a plea. The court explained that if there was any reluctance on his part in entering a plea, "you probably should not do that." (Plea T. 16). Purdum said he understood. The prosecutor

set out the evidence that he believed the government could prove at trial in support of the plea (Plea

T. 16-17) and both Purdum and his attorney agreed that the government could prove the facts.

After being advised as set out above, Purdum pled guilty to Counts 1 and 10. The court

accepted the plea, finding Purdum fully competent and capable of entering informed pleas and being

aware of the nature of the changes and the consequences of the pleas. The court stated the plea was

knowing and voluntary and there was a factual basis for it. In discussing bond, the court asked

Purdum if he had a passport and Purdum responded he had surrendered his passport.

The PSI report was prepared on May 28, 2004, and revised on July 21, 2004. In describing

Purdum's physical and mental condition, the probation officer stated that Purdum suffered a heart

attack in 2002 and was taking various medications.

At sentencing on October 15, 2004, Purdum was sworn and advised the court he did not have

"a whole lot of strength." (Sentencing T. at 1). When the court asked Purdum why he had failed to

appear for the scheduled sentencing two weeks earlier, he responded that he had just gotten out of

surgery at that time. The court asked Purdum what medications he had taken that day and if the

medication would interfere with his judgment or reasoning ability. Purdum responded he had taken

several medications which his wife had laid out for him and she could tell the court what they were

better than he could. The court responded, "Mr. Purdum, it's important for the Court to know that

you know and understand why we're here. We're here for your sentencing. Are you aware of that?"

Purdum responded, "I'll do my best, Your Honor." (Sentencing T. at 3). Purdum offered that he

thought he had reviewed the PSI report with revisions and defense counsel Horoda confirmed they

had gone over the documents and Purdum was provided a copy. Horoda also stated that Purdum was

also aware of the objections to the report. The court asked the attorneys if there were any reason the

plea agreement should not now finally be accepted and filed and made a part of the record and they responded in the negative.

Purdum presented six witnesses at sentencing, including friends, relatives, and associates who basically touted Purdum's positive character traits. Purdum's wife Jeannie Purdum testified that Purdum had not been in good health the last two years and had a triple bypass a month earlier. She added that Purdum was taking 18 different medications, some of which caused him to be drowsy, and he was not allowed to drive or be left alone. She explained that he takes two pills for pain, two for diabetes, three for his stomach, and some cholesterol medication. She stated that the pain medication was hydrocodone which might interfere with his knowledge of what was going on at sentencing because the medication makes him "sleepy and incapacitates him." (Sentencing T. at 48). She said the doctors advised he should be back to normal by January 2005.

The district court and the Assistant United States Attorney indicated their concern that a record should be made on the impact of Purdum's medications on him. The court expressed its fear that "after he's sentenced is he going to say I have no idea; I don't remember being there or whatever." (Sentencing T. at 49).

Purdum asked to speak and advised that he was "not all here" but was "trying to focus as best I can" and "trying to understand." *(*Sentencing T. at 50). He then told the court that if he had been more knowledgeable, the whole thing would probably not have happened and he knows that people lost monies and he would do his best to make restitution. He stated he was certainly sorry some people lost their money.

The judge responded, "Thank you, Mr. Purdum. Mr. Purdum, you appear to be articulate and competent this morning. That's the court's concern. Do you know why we're here and what

you're doing and what you've just said?" Purdum responded, "You said, you know, we're here for sentencing." The court then asked Purdum's attorney Mark Horoda if had been able to communicate with him in such a manner that the attorney believed he knew what was going on. Horoda responded, "Yes, Your Honor." (Sentencing T. at 50-51).

The court found that although Purdum had some physical limitations and was taking a great deal of medicine, he was competent to proceed. The Sentencing Guidelines recommended a sentencing range of 63-78 months. Horoda requested leniency in sentencing, stating Purdum pled guilty and has taken responsibility and "knows why we're here today." (Sentencing T. 54). The court stated its intention to sentence Purdum to 70 months in prison on Count 10 and 60 months on Count 1 with the sentences to run concurrently, three years supervised release, and restitution of $458,800. When Purdum was asked if he wished to say anything, he responded, "I don't know, Sir." (Sentencing T. 57). The court advised Purdum he had an absolute right to appeal and the notice of appeal needed to be filed within 10 days. (Sentencing T. 60). Purdum was allowed to remain on bond to allow for medical treatment and rehabilitation until his report date of January 10, 2005.

*Grounds for Relief*

*- Incapacity at Plea and Sentencing*

Purdum asserts that he was incapacitated during the plea and sentencing proceedings and the judge and his attorney failed to ensure that he was aware of the rights he was waiving by pleading guilty.

Purdum offers that of the 18 medications he was taking during the criminal proceedings, 5 are known to negatively impact reason and judgment. Purdum contends that 4 of the drugs cause vertigo, dizziness, weakness, disorientation, drowsiness, altered consciousness, reduced focus and

concentration, depression, and confusion, citing the 2000 version of the Physicians' Desk Reference. Regarding hydrocodone, Purdum states the drug causes sedation, drowsiness, mental clouding, impairment to mental performance, anxiety, fear, dysphoria, and mood changes, again citing the Physicians' Desk Reference. (Motion, at 6-7). Purdum contends that the transcript of proceedings shows his incapacity.

A valid plea must be knowing, intelligent, and voluntary, *Brady v. U.S.*, 397 U.S. 742, 747 (1970), meaning that it "represents a voluntary and intelligent choice among the alternative course of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)(quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). The test for competence is whether the defendant had a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. *Godinez v. Moran*, 509 U.S. 389 (1993).

A claim of ineffective assistance of counsel requires a showing that counsel's performance was deficient and that, but for counsel's unreasonable performance, there is a reasonably probability that the outcome of the proceedings would have been different. *Lockhart v. Fretwell*, 506 U.S. 364 (1993); *Strickland v. Washington*, 466 U.S. 668 (1984).

In my view, the transcripts of plea and sentencing proceedings are "inconsistent with an involuntary and unknowing state of mind" as asserted by Purdum. *See United States v. Rodriguez,* 205 F.3d 345, 349 (8th Cir. 2000); *United States v. Gray*, 152 F.3d 816, 820 (8th Cir. 1998).

At the plea hearing, which was prior to surgery, Purdum indicated he had reviewed and understood the plea agreement and that his medication was not affecting his judgment. The plea agreement set out at length the rights Purdum was waiving by pleading guilty. At the plea hearing,

the court carefully set out the rights Purdum was waiving and Purdum gave cognitive responses to the court's questioning. After observing Purdum's behavior, the court found Purdum competent to enter the guilty plea. Prior to sentencing, Purdum did not seek to withdraw his plea based on incapacity.

At sentencing, when Purdum's wife offered that some of his medications caused drowsiness and incapacitated him, the court made an inquiry into the matter with Purdum and his counsel and determined that Purdum was articulate and competent to proceed. Here, the matter of Purdum's capacity to proceed at the plea and sentencing proceedings was delved into by the court which found Purdum did not lack the capacity to proceed. Nothing suggests that the court or counsel were derelict in the matter..

*Waiver of Right to Appeal Constitutionality of Guidelines*

Purdum contends that although the plea agreement contains a waiver of the right to appeal the constitutionality of the guidelines, the waiver was nullified when the judge advised him at sentencing that he had an "absolute" right to appeal. (Sentencing T. at 60). This argument is meritless. Purdum's plea, which I have found to be validly entered, was premised on the plea agreement with the specific waiver of the right to appeal the constitutionality of the guidelines. The court's mere failure to specify at sentencing the limits the plea agreement placed on Purdum's appeal rights could not reasonably be viewed as a nullification of the waiver. *See United States v. Michelsen*, 141 F.3d 867, 872 (8th Cir. 1998) (a court's recitation of statutory right to appeal could not unilaterally revoke an earlier waiver of appeal rights).

*Sentencing Errors*

In the PSI report, Count 1 (conspiracy to commit mail/wire fraud) was assigned a base offense level of 6 which was increased by 9 levels based on a loss range of $350,000 to $500,000. Two points were added for more than minimal planning and 4 points for having a organizer or leadership role in the offense, for an adjusted offense level of 21. As to Count 10 (conspiracy to commit money laundering), the base offense level was 23 and no enhancements for role in the offense were imposed. These calculations were agreed to by Purdum in the plea agreement.

The 2003 version of the Sentencing Guidelines required that fraud and money laundering counts be grouped under U.S.S.G. §3D1.2 but the probation officer determined that grouping the counts would not be beneficial to Purdum and he used the 1998 version of the guidelines which did not require grouping and determined the combined offense level of the counts under U.S.S.G. §3D1.4(a). Using the highest offense level (Count 10 at 23) as required, the probation officer increased the offense level by 2 levels, attributing one level to Count 10 and one level to Count 1 as an equally serious offense (meaning 1 to 4 levels less serious). The result was an offense level of 25. A 3-point downward adjustment for acceptance of responsibility was given with a total offense level was 22. With 7 criminal history points resulting in a criminal history category of IV, the guideline range was 63 to 78 months. The PSI report also stated that Purdum would be responsible for $458,000 in restitution.

Both the government and Purdum filed objections to the report. The government objected that no enhancement had been made to Count 10 for role in the offense, that Counts 1 and 10 were not grouped as required by the 2003 Sentencing Guidelines Manual, and that certain amounts repaid

by Purdum were not subtracted from the restitution amount. Among his objections, Purdum objected to the amount of restitution and that Counts 1 and 10 were not grouped.

At sentencing, the court and parties discussed the impact of the *Blakely* decision to Purdum. The prosecutor brought out that Purdum had agreed in the plea agreement not to contest the constitutionality of the guidelines and that enhancements were based on his admissions and matters agreed to in the plea agreement. Horoda on behalf of Purdum stated that all his client wanted was a proper application of the guidelines. The court stated that it would assume the guidelines were in effect until ruled unconstitutional or if ruled unconstitutional the court was referring to them in an advisory capacity only. The parties agreed.

The probation officer was called to testify concerning his failure to group Counts 1 and 10 and his use of the 1998 guidelines manual. He explained that the counts involved were dissimilar and did not meet the test for grouping under U.S.S.G. § 3D1.2. He admitted that under a provision in the 2003 guidelines, fraud and money laundering were grouped but he offered that the provision was not retroactive and the result would be a higher adjusted offense level taking into consideration the enhancements that applied to Count 1. He explained that by using the 1998 guidelines, based on conduct of Purdum that occurred in 1998, the crimes were not grouped, resulting in a lesser adjusted offense level for Count 10. After hearing the probation officer's explanation, Horoda agreed that the 1998 guidelines were more beneficial to Purdum. The probation officer further explained he did not assess an enhancement for Count 10 based on role in the offense because the money laundering offense did not require a whole lot of leadership or extensive activity involving a lot of people.

Judge Dawson determined that the counts would not be grouped and would be treated under the 1998 guidelines which were more advantageous to Purdum. The court further stated that it would not impose an enhancement to Count 10 based on role in the offense. The judge imposed 70 months on Count 10, 60 on count 1, with the sentences to run concurrently, and imposed restitution in the amount of $458,800.

Purdum now argues that the district court erred and his attorney failed to object when an enhancement was imposed to the base level offense level of Count 1 for being a leader/organizer, duplicate enhancements were imposed to the base offense level of Count 1 for more than minimal planning and also being an organizer/leader, 9 levels were assessed to the base offense level of Count 1 for the amount involved, the 1998 version of the guidelines were used, and his criminal history category was based on an embezzlement conviction for which he received a commuted sentence.

The factual background set out above shows that the Purdum's involvement in Count 1 (conspiracy to commit fraud) well-qualified him for an enhancement for his leader/organizer role in the offense under U.S.S.G. §3B1.1(a). Purdum, in fact, agreed to the enhancement as part of the plea agreement. Further, Purdum has no viable argument that he could not be assessed enhancements for both "more than minimal planning" and being a leader/organizer role in the offense because the Eighth Circuit held otherwise in *United States v. Willis*, 997 F.2d 407, 418-19 (8th Cir. 1993).

Purdum contends that the 9-point enhancement to Count 1 based on the amount of the loss was incorrect. He states that 12 victims with losses of $124,000 should have been excluded from the calculation of loss because by the time the victims incurred the losses, he had relinquished his position and therefore had no role and could not have "reasonably foreseen" the losses. Purdum

states that with these individuals' losses subtracted, the loss amount would have totaled $334,000 for a 8-point enhancement.

The PSI report states that by the time of Purdum's purported resignation from ARLCO in late 1998, he and Clopp has essentially dissipated all of the investors' funds and, subsequent to Purdum's resignation, he and Clopp were involved in other solicitations of investors to fund the testing of the metal extraction process and to raise funds for ARLCO. As pointed out at the plea proceeding and in the PSI report, Purdum played a lead role in the fraud upon ARLCO investors and he was aware that ARLCO monies were not being spent as promised but were being intentionally misappropriated. Even if some investors lost money after Purdum resigned, Purdum had no viable argument that he did not reasonably foresee those losses.

Purdum has not shown that the enhancements to Count 1 were erroneous. Thus, Purdum has no valid claim that it would have been more beneficial to group the counts under the 2003 guidelines.

Purdum argues that his criminal history was wrongly enhanced to category IV based on 1980's Oklahoma convictions for embezzlement because the judge made no findings as to the validity of the convictions, citing *United States v. Shepard*, 125 S.Ct. 1254 (2005) and *United States v. Washington*, 404 F.3d 834 (4th Cir. 2005). Purdum is misguided in relying on these cases which deal with enhancements based on a judge's factual findings that the defendants committed an offense under the Armed Career Criminal Act or an act that could be labeled a "violent felony" under 2K2.1(a)(4). Here, criminal history category IV was calculated based on Purdum's receiving 3 points each for 1983 embezzlement convictions in separate cases and 1 point for a 1992

embezzlement conviction. The convictions were properly calculated under U.S.S.G. § 4A1.1(a) and (c) and the district judge was not required to assess the validity of the convictions.

Purdum finally contends that after serving 15 months of a 5-year sentence in one of the Oklahoma embezzlement cases, No. CFR 83-16, the sentence was then commuted by the governor. According to Purdum, the court failed to determine whether the conviction still amounted to a felony conviction under Oklahoma law as required by U.S.S.G. § 4A1.2(o) and failed to consider that if the conviction was actually a misdemeanor, it could not be considered because it occurred more than 10 years prior to the commencement of the instant offense. U.S.S.G. § 4A1.2(e)(2).

This claim is unavailing. I have telephonically verified with Kevin Moore, in charge of offender records at the Oklahoma Department of Correction, that the governor commuted Purdum's 5-year sentence in the 1983 case to time served after Purdum had served approximately 19 months. As such, the governor's commutation or reduction of the sentence did not vacate the felony conviction which could be considered for sentencing purposes because it came within the 15-year period applicable to felony convictions. U.S.S.G. § 4A1.2(e)(1).

*Booker*

Purdum contends that his sentence was enhanced based on court findings rather than jury findings in violation of the Sixth Amendment as held by *United States v. Booker*, ___ U.S. ___, 125 S.Ct. 738 (2005). In *Booker*, the Supreme court restated its earlier holding in *Blakely v. Washington*, ___U.S. ___, 124 S.Ct. 2531 (2004) that the Sixth Amendment requires that any fact which leads to a sentencing enhancement, other than the fact of a prior conviction, must be found by a jury or admitted by the defendant. The court in *Blakely* found unconstitutional a Washington State sentencing scheme in which a sentencing enhancement could be based on judge-found facts. In

*Booker*, the Court held that the federal Sentencing Guidelines, which directed enhancements based on judge-found facts, was unconstitutional. The Court made the mandatory Guidelines advisory only.

The circuit courts have consistently held that *Booker* does not apply to convictions that became final prior to issuance of the decision and, thus, the decision is not retroactively applied. *Never Misses a Shot v. United States*, 413 F.3d 781, 783-84 (8th Cir. 2005). As such, *Booker* offers no relief to Purdum. Also, Purdum waived any potential *Blakely* error.

CONCLUSION

Based on the above, I recommend that the instant motion be denied and dismissed with prejudice. A §2255 motion may be dismissed without a hearing if the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than facts. *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

**The parties have ten days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of th right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 9th day of January 2006.

/s/Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE